# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

YONO v DEPARTMENT OF TRANSPORTATION

Docket No. 150364. Argued December 9, 2015 (Calendar No. 3). Decided July 27, 2016.

Helen Yono brought an action in the Court of Claims against the Department of Transportation, seeking damages for injuries sustained when she stepped into a depression in a parallel-parking space and fell. Her accident occurred in the village of Suttons Bay, where she had parked in a space specifically designated for parallel parking along the northbound side of M-22, a highway under the jurisdiction of the department. Yono alleged that the department had breached its duty under MCL 691.1402(1) to maintain the improved portion of M-22 in a condition reasonably safe and convenient for public travel and was liable under the highway exception to governmental immunity. The department moved for summary disposition, acknowledging its duty to maintain the improved portion of M-22 designed for vehicular travel but arguing that that it was entitled to governmental immunity because the parking lane had not been designed for vehicular travel. The court, Clinton Canady, III, J., denied the motion. The Court of Appeals, BECKERING and M. J. KELLY, JJ. (TALBOT, P.J., dissenting), affirmed, concluding that the parallel-parking lanes on the portion of M-22 at issue were designed for vehicular travel. 299 Mich App 102 (2012). The Supreme Court ordered and heard oral argument on the department's application for leave to appeal, 495 Mich 859 (2013), and subsequently remanded the case to the Court of Appeals to consider what standard a court should apply in determining as a matter of law whether a portion of highway was designed for vehicular travel within the meaning of MCL 691.1402(1) and whether Yono had pleaded sufficient facts to create a genuine issue of material fact under that standard, 495 Mich 982 (2014). On remand, the Court of Appeals, BECKERING, P.J., and BORRELLO and M. J. KELLY, JJ., again affirmed the Court of Claims and concluded that Yono had pleaded in avoidance of governmental immunity. The panel determined that the department had a duty to maintain in reasonable repair any part of the highway that was specifically designed—that is, planned, purposed, or intended—to support travel by vehicles, even if the lanes were designed as specialized, dual-purpose, or limited-access travel lanes. The panel rejected the department's contention that paint markings used on a highway permit an inference concerning a highway's actual design because a governmental agency's decision to paint markings on a highway does not alter the fact that the highway was actually designed for vehicular travel over its full width. Because vehicles must travel into and out of parallel parking lanes in order for those lanes to serve their purpose and the designers of M-22 must have designed the parallel-parking lanes to support limited, albeit regular, vehicular travel beyond that which accompanies the use of the lanes for parking, the Court of Appeals

concluded that the portion of M-22 at issue in this case fell within the department's duty under the highway exception. 306 Mich App 671 (2014). The Supreme Court granted the department's application for leave to appeal. 497 Mich 1040 (2015).

In an opinion by Justice LARSEN, joined by Chief Justice YOUNG and Justices MARKMAN and ZAHRA, the Supreme Court *held*:

Governmental immunity applies to a parallel-parking lane that is designated exclusively as such by painted lines on the highway because that lane is not designed for vehicular travel within the meaning of the of the highway exception to governmental immunity.

1. Under the governmental tort liability act, MCL 691.1401 *et seq.*, the immunity conferred on governmental agencies is broad and the statutory exceptions to that immunity must be narrowly construed. MCL 691.1407(1) provides that except as otherwise provided in the act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Under the highway exception, MCL 691.1402(1), each governmental agency having jurisdiction over a highway must maintain that highway in reasonable repair so that it is reasonably safe and convenient for public travel. An injured person, including a pedestrian, may recover damages from the governmental agency arising out of the agency's failure to do so. The duty, however, extends only to the improved portion of the highway designed for vehicular travel, that is, only the travel lanes of the highway. The question in this case was whether a parking lane is a travel lane—and therefore designed for vehicular travel—within the meaning of MCL 691.1402(1).

2. *Grimes v Dep't of Transp*, 475 Mich 72 (2006), held that the improved shoulder of a highway was not designed for vehicular travel because the word "travel" does not encompass the incremental movement that accompanies a vehicle's movement from the travel lanes onto the shoulder. The fact that a shoulder could support even momentary vehicular travel (such as when a motorist momentarily swerves onto it) was not enough to transform the shoulder into a lane designed for vehicular travel. A shoulder is designed as a temporary breakdown or emergency area and is not intended or designed to be part of a traveler's journey from one location to another. The instant case required a determination of whether a lane of designated, curbside parallel-parking spaces was designed for vehicular travel, so *Grimes* might be read as not directly controlling. A parallel-parking lane specifically invites drivers to end their journeys there and, sometime later, begin new journeys, in a way that a shoulder does not. Under *Grimes*, however, it was necessary to avoid confusing the potential uses that a highway could support with what its design was intended to accomplish. Simply because an area of a highway can support vehicular travel in ways that are not part of its design does not bring it within the highway exception. The Court of Appeals attempted to distinguish use from design, but erred by focusing too narrowly on the highway's initial design, rather than the highway's design at the time of Yono's injury. The department's ongoing duty under MCL 691.1402(1) ensures that a highway's design is neither static nor dependent exclusively on whether a roadbed structure can support vehicular travel. Contrary to the Court of Appeals' conclusion, paint markings and other traffic control devices can delineate how a highway is designed and redesigned over its useful life.

3. The department was entitled to governmental immunity. At the time of Yono's injury, the area at issue was specifically marked as a parallel-parking lane. The department, under its statutory authority to draft the Manual on Uniform Traffic Control Devices, specifically differentiated lanes designed as parallel-parking lanes from lanes designed for travel. Although some lanes on a highway might be designed for dual purposes, the only traffic-control devices present in the lane at issue in this case indicated that it was designed to be used as a parallel-parking lane. The Court of Appeals erred by concluding that the momentary ingress and egress necessarily accompanying parallel parking is considered travel even though the same basic action was not considered travel in *Grimes*. That a person will park at the end of travel does not turn parking itself into travel.

Reversed and remanded to the Court of Claims.

Justice MCCORMACK, joined by Justices VIVIANO and BERNSTEIN, dissenting, agreed with the majority that the paint markings on the roadbed showed that the portion of the highway at issue was designed for at least parallel parking, but disagreed that a portion of a highway designed for parallel parking is not designed for vehicular travel. A portion of a highway is designed for vehicular travel if it is designed, or intended for, a vehicle's planned and purposeful progression from origin to destination, that is, to provide a route for a vehicle's passage from one point to another. A highway may be designed to provide vehicles with any number of such routes, and the improved portions that fall within those intended routes are designed for vehicular travel and subject to the highway exception's duty of repair and maintenance. A portion of the highway designated as a location for parking a vehicle is designed to provide the beginning and ending segments of the highway's intended routes. A vehicle's passage through those segments constitutes a part of its travel as much as that vehicle's passage through various other segments of an intended route, such as those designated for thoroughfare, merging, turning, and so forth. The lines delineating the parking spots, like those marking other segments, specifically invite a vehicle to drive over that portion of the highway and offer guidance about how to do so. The majority posited that under *Grimes*, the highway exception only reaches travel lanes, which it viewed as distinct from parking lanes. While *Grimes* used the phrase "travel lane" in articulating its holding, the highway exception does not, nor does it otherwise address or differentiate between types of lanes. Furthermore, a parking lane is simply one type of travel lane for purposes of the highway exception given that it is designed to be used by a vehicle to complete and begin its passage along a route from one point to another. The majority also relied on *Grimes* to conclude that a vehicle's entry into and exit from a parking lane is indistinguishable from its use of a shoulder. While *Grimes* rejected the notion that travel should be understood as including every incremental or momentary movement a vehicle may make over an improved portion of a highway, it did not hold that travel necessarily excludes every vehicular movement that could be characterized as momentary, incremental, or short. *Grimes* did not offer an affirmative definition of "travel." Rather, it clarified that travel could not be construed so broadly as to categorically include every movement a vehicle does or could make on an improved portion of the highway. Neither *Grimes* nor any other caselaw indicated that the phrase "designed for vehicular travel" should be read as excluding any portion of a highway designed to be used as part of a vehicle's intended route between two points. The majority's conclusion otherwise did not comport with this precedent, the plain language of the highway exception, or the overarching goal of interpreting the governmental tort liability act to create a

cohesive, uniform, and workable set of rules that will readily define the injured party's rights and the governmental agency's liability.  Accordingly, Justice MCCORMACK would have affirmed the denial of the department's motion for summary disposition.

©2016 State of Michigan

# OPINION

Chief Justice:           Justices:
Robert P. Young, Jr.     Stephen J. Markman
                         Brian K. Zahra
                         Bridget M. McCormack
                         David F. Viviano
                         Richard H. Bernstein
                         Joan L. Larsen

FILED  July 27, 2016

S T A T E  O F  M I C H I G A N

SUPREME COURT

HELEN YONO,

      Plaintiff-Appellee,

v                                                    No. 150364

DEPARTMENT OF TRANSPORTATION,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

LARSEN, J.

This is a line-drawing case, both literally and figuratively.  We are asked to decide whether a parallel-parking lane, designated exclusively as such by painted lines on the highway, is "designed for vehicular travel" within the meaning of the highway exception[1] to the governmental tort liability act (GTLA).[2]  Guided by our precedent and by the admonition that we are to narrowly construe exceptions to governmental immunity,[3] we

---

[1] MCL 691.1402(1).

[2] MCL 691.1401 *et seq*.

[3] *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 158; 615 NW2d 702 (2000).

conclude that it is not. Accordingly, we reverse the judgment of the Court of Appeals, which held otherwise, and remand this case to the Court of Claims for entry of summary disposition on behalf of defendant.

## I. FACTS AND PROCEDURAL HISTORY

In 2011, plaintiff, Helen Yono, visited the village of Suttons Bay and parked in a space specifically designated for parallel parking along the northbound side of M-22, a highway under the jurisdiction of defendant, the Michigan Department of Transportation (the Department). When returning to her car, she stepped into a depression in the area designated as a parallel-parking space, fell, and suffered injuries. She filed suit in the Court of Claims, alleging that the Department had breached its duty to maintain the improved portion of M-22 in a condition "reasonably safe and convenient for public travel."[4]

The Department moved for summary disposition under MCR 2.116(C)(7), claiming that it was entitled to governmental immunity. The Department acknowledged its duty, set forth in MCL 691.1402(1), to maintain the "improved portion of" M-22 that is "designed for vehicular travel," but argued that Yono's injury had not occurred on that portion of the highway because the parking lane was not designed for vehicular travel. Plaintiff countered that the entire roadbed, from one curb to the other, was designed for vehicular travel; as a result, she claimed that she had pleaded in avoidance of

---

[4] MCL 691.1402(1).

2

governmental immunity. For the court's review of defendant's motion, each party submitted an affidavit from an expert who was a highway engineer.[5]

The Court of Claims denied the Department's motion for summary disposition. The court reasoned that plaintiff had alleged an injury that occurred "in the portion of the road . . . designed for vehicular travel because [a] vehicle would have to travel to get to the parking spot . . . ."

A divided Court of Appeals affirmed.[6] The majority observed that "the highway—including that portion designated for parallel parking—is a contiguous whole; the portion where parallel parking is permitted is not physically separated from the center of the highway by a median, driveway, or other barrier."[7] The majority agreed with the Court of Claims that "the lanes designated for parking were designed to permit vehicles to merge both from the center lanes to the parking lanes and from the parking lanes to the center lanes."[8] Moreover, the majority surmised that "the parallel parking lanes were designed to be used (when unoccupied) to travel around stopped or slow vehicles that are

---

[5] Defendant's expert, one of its development engineers, averred that the parallel-parking lane where plaintiff's injury occurred "is not considered part of the traveled way" and instead is separated from the travel lanes by a buffer zone. Plaintiff's expert averred that the entire paved surface consists of travel lanes, that the parallel-parking lane is dual purpose for travel and parking, and that "the only difference between the differently labeled travel lanes is the type of paint marks or striping and the measured widths of the travel lanes."

[6] *Yono v Dep't of Transp*, 299 Mich App 102; 829 NW2d 249 (2012) (*Yono I*).

[7] *Id*. at 111.

[8] *Id*.

3

in the center lanes and for turns."[9] Indeed, the majority observed that "[a]bsent the painted markings, the area for parallel parking would be indistinguishable from the remainder of the highway."[10] For all these reasons, the majority concluded that the parallel-parking lanes were "designed for vehicular travel."

The dissent would have held that any vehicular travel in the parallel-parking lane "is merely 'momentary' and under limited circumstances" and that this momentary use does not "transform the purpose of its design" into vehicular travel.[11] The dissent disputed the majority's contention "that the parallel parking lane at issue was designed to be used, when unoccupied, to travel around stopped or slow vehicles in the travel lane or as a thoroughfare because those contentions are not supported by the record" and "MCL 257.637 . . . states in pertinent part that '[t]he driver of a vehicle shall not overtake and pass another vehicle upon the right by driving off the . . . main-traveled portion of the roadway.' "[12] And even if drivers did so use the parking lane, that would "not establish that the lane was designed for such."[13]

---

[9] *Id*. To support this proposition, the majority claimed that the Michigan Vehicle Code allows drivers "to use that type of area as a travel lane when the highway has 'unobstructed pavement not occupied by parked vehicles of sufficient width for 2 or more lines of moving vehicles in each direction[.]' " *Id*. at 111-112, quoting MCL 257.637(1)(b).

[10] *Id*. at 111.

[11] *Id*. at 116 (TALBOT, P.J., dissenting).

[12] *Id*. at 117 (alteration in original).

[13] *Id*. at 117.

This Court ordered oral argument on the Department's application for leave to appeal.[14] Following argument, we remanded the case to the Court of Appeals to consider "what standard a court should apply in determining as a matter of law whether a portion of highway was 'designed for vehicular travel,' as used in MCL 691.1402(1)," and "whether the plaintiff has pled sufficient facts to create a genuine issue of material fact under this standard."[15]

On remand, the Court of Appeals again affirmed the Court of Claims and concluded that plaintiff had pleaded in avoidance of governmental immunity.[16] The panel determined that defendant's duty is "to maintain in reasonable repair any part of the highway that was specifically designed—that is, planned, purposed, or intended—to support travel by vehicles . . . , even if the lanes were designed as 'specialized, dual-purpose, or limited-access travel lanes.' "[17] The panel discounted the relevance of the defense expert's affidavit because the expert "never averred that he participated in or otherwise had knowledge of the actual design of the particular section of M-22 at issue in this case . . . ."[18] The panel "reject[ed] the Department's repeated contention that the paint markings used on a highway permit an inference concerning a highway's actual

---

[14] *Yono v Dep't of Transp*, 495 Mich 859 (2013).

[15] *Yono v Dep't of Transp*, 495 Mich 982, 982-983 (2014).

[16] *Yono v Dep't of Transp (On Remand)*, 306 Mich App 671, 675, 685-686; 858 NW2d 128 (2014) (*Yono II*).

[17] *Id*. at 692, quoting *Yono I*, 299 Mich App at 110.

[18] *Yono II*, 306 Mich App at 693-694.

5

design" because a "governmental entity's decision to paint markings on the highway does not alter the fact that the highway was actually designed for vehicular travel over its full width."[19] Because "vehicles must travel into and out of parallel parking lanes in order for those lanes to serve their purpose," and because "the designers of M-22, at minimum, must have designed the parallel parking lanes at issue to support limited, albeit regular, vehicular travel beyond that which accompanies the use of the lanes for parking," the panel concluded that the portion of M-22 at issue in this case fell within the duty outlined in the highway exception.[20]

This Court granted the Department's application for leave to appeal.[21]

## II. STANDARD OF REVIEW

We review de novo the question whether the Department is entitled to summary disposition under MCR 2.116(C)(7) on the basis of governmental immunity.[22] We similarly review de novo the underlying questions of statutory interpretation.[23]

## III. ANALYSIS

In 1964, the Legislature enacted GTLA "to make uniform the liability of municipal corporations, political subdivisions, and the state, its agencies and departments,

---

[19] *Id*. at 695-696.

[20] *Id*. at 695.

[21] *Yono v Dep't of Transp*, 497 Mich 1040 (2015).

[22] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[23] *Whitman v City of Burton*, 493 Mich 303, 311; 831 NW2d 223 (2013).

6

when engaged in a governmental function . . . ."[24]  Under MCL 691.1407(1), "[e]xcept as otherwise provided in [GTLA], a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."[25]  This immunity "is expressed in the broadest possible language—it extends immunity to all governmental agencies for *all* tort liability whenever they are engaged in the exercise or discharge of a governmental function."[26]  The Legislature has provided six exceptions to this broad grant of immunity, which courts must "narrowly construe[]."[27]  One of these, the highway exception, exposes the Department to tort liability for failing to maintain in reasonable repair the highways within its jurisdiction.[28]

---

[24] 1964 PA 170, title.  Approximately three years before GTLA's  enactment,, this Court had abolished common-law governmental immunity for municipalities.  *Williams v Detroit*, 364 Mich 231; 111 NW2d 1 (1961).  As amended by 2002 PA 400, GTLA's title now provides that it is an act "to make uniform the liability of municipal corporations, political subdivisions, and the state, its agencies and departments, officers, employees, and volunteers thereof . . . when engaged in the exercise or discharge of a governmental function . . . ."

[25] MCL 691.1401(b), as amended by 2012 PA 50, defines "governmental function" as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."  The prior version of the statute, as amended by 2001 PA 131, differed only in that this definition appeared in Subdivision (f) instead.

[26] *Nawrocki*, 463 Mich at 156, citing *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 618; 363 NW2d 641 (1984).

[27] *Nawrocki*, 463 Mich at 158 (emphasis omitted).

[28] MCL 691.1402(1), as amended by 2012 PA 50, provides in full:

> Each governmental agency having jurisdiction over a highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel.  A person who sustains bodily injury or damage to his or her property by reason of failure of a governmental agency to keep a highway under its jurisdiction in reasonable repair and in a

7

The Legislature has specified, however, that this duty "extends only to the improved portion of the highway designed for vehicular travel . . . ."[29]

The first sentence of MCL 691.1402(1) articulates the general duty of a governmental agency: "Each governmental agency having jurisdiction over a highway shall maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel."[30] The second sentence allows an injured person to recover damages from the governmental agency arising out of its "failure . . . to keep a highway

condition reasonably safe and fit for travel may recover the damages suffered by him or her from the governmental agency. The liability, procedure, and remedy as to county roads under the jurisdiction of a county road commission shall be as provided in section 21 of chapter IV of 1909 PA 283, MCL 224.21. Except as provided in [MCL 691.1402a], the duty of a governmental agency to repair and maintain highways, and the liability for that duty, extends only to the improved portion of the highway designed for vehicular travel and does not include sidewalks, trailways, crosswalks, or any other installation outside of the improved portion of the highway designed for vehicular travel. A judgment against the state based on a claim arising under this section from acts or omissions of the state transportation department is payable only from restricted funds appropriated to the state transportation department or funds provided by its insurer.

This statute has only minor differences from the prior version, as amended by 1999 PA 205, which are not relevant to our decision.

[29] *Id*.

[30] MCL 691.1401(c), as amended by 2012 PA 50, defines "highway" as "a public highway, road, or street that is open for public travel. Highway includes a bridge, sidewalk, trailway, crosswalk, or culvert on the highway. Highway does not include an alley, tree, or utility pole." The prior version of the statute, as amended by 2001 PA 131, differed in that the definition appeared in Subdivision (e) instead and used plural forms for "bridge," "sidewalk," etc.

under its jurisdiction in reasonable repair and in a condition reasonably safe and fit for travel . . . ."[31] The fourth sentence clarifies that

> the duty of a governmental agency to repair and maintain highways, and the liability for that duty, extends only to the improved portion of the highway designed for vehicular travel and does not include sidewalks, trailways, crosswalks, or any other installation outside of the improved portion of the highway designed for vehicular travel.[32]

When interpreting GTLA, courts must keep in mind that "the immunity conferred upon governmental agencies is broad, and the statutory exceptions thereto are to be narrowly construed."[33]

In *Nawrocki v Macomb Co Rd Comm*, this Court held that the fourth sentence of MCL 691.1402(1) "narrows the duty of . . . the state . . . with regard to the *location* of the dangerous or defective condition," but not with regard "to the *type* of travel *or* traveler."[34] Pedestrians, such as Yono, may therefore plead in avoidance of governmental immunity as long as "the condition proximately causing injury or property damage is located in the improved portion of the highway designed for vehicular travel [and] not otherwise expressly excluded . . . ."[35] In *Grimes v Dep't of Transp*, this Court held "that only the travel lanes of a highway are subject to the duty of repair and

---

[31] MCL 691.1402(1).

[32] *Id*.

[33] *Nawrocki*, 463 Mich at 158 (emphasis omitted).

[34] *Id*. at 171.

[35] *Id*.

9

maintenance specified in MCL 691.1402(1)."[36]  Consistently with our precedent, then, this case asks us to decide whether a parking lane is a "travel lane"—and therefore "designed for vehicular travel"—within the meaning of the statute.[37]

In some sense, to ask this question is to answer it.  In common English usage, a parking lane is closer to being a travel lane's antonym than its synonym.  To park is to stop; to travel is to go.  Deeper analysis confirms this initial impression.

In *Grimes*, the Court concluded that the improved shoulder of a highway was not designed for vehicular travel within the meaning of the highway exception because "travel" does not encompass the incremental movement that accompanies a vehicle's movement from the travel lanes onto the shoulder.[38]  In so concluding, the Court cautioned against "conflat[ing] two disparate concepts: design and contemplated use."[39]

---

[36] *Grimes v Dep't of Transp*, 475 Mich 72, 91; 715 NW2d 275 (2006).

[37] The parties do not ask us to revisit *Grimes*, but the dissent claims that *Grimes*'s holding "must not be permitted to obscure or supplant the language chosen by the Legislature to express its intent." *Post* at 2.  We agree that the statutory language prevails. *Grimes*'s holding is this Court's interpretation of when the improved portion of the highway is "designed for vehicular travel" for purposes of MCL 691.1402(1), and we are not free to disregard it.  Moreover, we view this language as a fitting shorthand for whether a particular portion of the highway is "designed for vehicular travel."  The dissent agrees that paint markings matter in discovering a highway's design.  It is common to speak of paint markings on a highway as denoting "lanes," "such as a 'thoroughfare lane,' a 'merge lane,' a 'turn lane,' and so on[.]" *Post* at 7.  The only dispute in this case is whether a "parking lane" necessarily counts as a "travel lane," i.e., whether its designation for parking, without any other indicia of its being designed for travel, is sufficient to make it "designed for vehicular travel."

[38] *Grimes*, 475 Mich at 89-90.

[39] *Id*. at 90.

10

Thus, the question in *Grimes* was not whether "road shoulders are 'designed' with the intention that they be *used* by vehicles"; the Department did not, in fact, dispute that they were.[40] The question instead was whether "shoulders are designed as *travel* lanes."[41]

To be designed as a travel lane and therefore to be designed for vehicular travel, the Court explained, required something more than the fact that the shoulder "could support even momentary vehicular 'travel.' "[42] The mere fact that "a motorist momentarily swerv[ing] onto the shoulder" could, in a broad sense, "be said to have traveled on the shoulder" was not enough to transform the shoulder into a lane "designed for vehicular travel."[43]

This case presents a question more difficult than the one at issue in *Grimes*, but both focus on what constitutes vehicular travel.[44] The shoulder of a highway is designed as a temporary breakdown or emergency area. It is not intended or designed to be part of a traveler's journey from one location to another. This case calls on us to determine whether a lane of designated, curbside parallel-parking spaces is designed for vehicular travel within the meaning of the highway exception. A parallel-parking lane specifically

---

[40] *Id*. at 89.

[41] *Id*.

[42] *Id*. at 90.

[43] *Id*. at 89.

[44] This more general understanding of vehicular travel stands in opposition to that of the dissenting opinion, which focuses on an individual's travel route. MCL 691.1402(1) directs the Court to look not at a person's actual journey from one point to another, but instead to the way in which the road was designed and whether that design was generally intended for vehicular travel.

invites drivers to end their journeys there and, sometime later, begin new journeys, in a way that a shoulder does not. As a result, *Grimes* might be read as not controlling the outcome of this case. Nevertheless, *Grimes* cautions against confusing the potential uses that a highway "could support"[45] with what its design was intended to accomplish. In other words, just because an area of a highway can support vehicular travel in ways that are not part of its design does not bring it within the highway exception. Plaintiff's evidence that the roadbed structure is consistent from curb to curb shows only that the entire roadbed could *support* vehicular travel, not that the entire roadbed was "*designed for vehicular travel.*"

The Court of Appeals attempted to distinguish use from design, but its analysis focused too narrowly on the highway's *initial* design, rather than the highway's design at the time of the injury. The panel used a hypothetical example to illustrate the importance of a highway's initial design: "A governmental entity might have designed a particular highway to support vehicular travel for its full width, but might have later decided to limit the traffic to a narrow portion in the center of the highway for safety reasons or even to facilitate parking for businesses."[46] In this scenario, the panel determined that "the governmental entity's decision" to limit vehicular travel on the highway would "not alter the fact that the highway was actually designed for vehicular travel over its full width" when it was initially constructed.[47] The panel also emphasized its belief that "paint

---

[45] *Id*. at 90.

[46] *Yono II*, 306 Mich App at 695-696.

[47] *Id*. at 696.

markings on the highway do not correspond to the actual design . . . in the absence of specific evidence connecting the design with the proposed markings . . . ."[48]

By focusing on the highway's design at the time of its initial construction, rather than its design at the time of the injury, the Court of Appeals ignored the Department's ongoing duty to ensure that the highways of this state are safe for vehicular travel.[49] That ongoing duty ensures that a highway's design is neither static nor dependent exclusively on whether a roadbed structure can "support vehicular travel."[50] Contrary to the Court of Appeals' conclusion, paint markings and other traffic control devices can and do delineate how a highway is designed and redesigned over its useful life.[51]

Consider a situation familiar to all Michigan drivers: highway repairs. Suppose a state highway develops a sinkhole within a travel lane that renders the lane unsafe for travel. As the Department repairs the defect in the highway, it might place traffic-control devices—including barricades, signage, and paint markings—to authorize drivers to

---

[48] *Id.* By using the phrase "proposed markings," the Court of Appeals suggested that the only potentially relevant paint markings are those predating the highway's construction.

[49] MCL 691.1402(1).

[50] See *Yono II*, 306 Mich App at 695-696.

[51] The Michigan Vehicle Code provides an explicit connection between a highway's traffic-control devices and the Department's design for a highway. MCL 257.608 gives the Department, in conjunction with the State Police, the authority to "adopt a manual and specifications for a uniform system of traffic-control devices . . . for use upon highways within this state." MCL 257.611(1) gives those traffic-control devices legal effect for enforcing the Department's intended design of a highway by providing that "[t]he driver of a vehicle . . . shall not disobey the instructions of a traffic control device . . . ."

travel along what had initially been designed as the highway's shoulder. That shoulder—not the closed lane under repair—would then have been redesigned "for vehicular travel" within the meaning of MCL 691.1402(1), albeit temporarily. Once the repair is complete, the traffic-control devices would be removed, the paint lines would again designate the area as a shoulder, and the design of the highway would again have changed and reverted back to its initial design as a shoulder.

As a result, and contrary to the Court of Appeals' analysis, we must consider how the Department had designed the highway at the time of the alleged injury. The parties do not dispute that the area at issue in this case was specifically marked as a parallel-parking lane at the time of the alleged injury. The Department, in exercising its statutory authority to draft the Manual on Uniform Traffic Control Devices,[52] has specifically differentiated lanes designed as parallel-parking lanes from lanes designed for travel.[53] Although some lanes on a highway might be designed for dual purposes, the only traffic-control devices present in the lane at issue in this case indicate that it was designed to be used as a parallel-parking lane.[54] Although plaintiff's expert opined that drivers

---

[52] See MCL 257.608.

[53] The manual defines "traveled way" as "the portion of the roadway for the movement of vehicles, exclusive of the shoulders, berms, sidewalks, and parking lanes." Manual on Uniform Traffic Control Devices (2011 Michigan MUTCD), p 22.

[54] The similar circumstance of angled on-street parking helps to illustrate the single purpose delineated by the paint markings at issue in this case. Where the Department or a local road authority has provided angled on-street parking for drivers, it is evident that the highway is not designed for vehicles to use the entire width of the paved surface for travel, even when unobstructed. We do not see any substantive difference between specifically delineated angled-parking spaces and parallel-parking spaces.

14

sometimes travel along the parallel-parking lane when it is convenient to do so, the evidence presented regarding the lane's *design*—the paint delineating the individual parallel-parking spaces—showed a parallel-parking lane, not a travel lane.[55]

The dissent and the Court of Appeals conclude that the momentary ingress and egress necessarily accompanying parallel parking independently warrants the determination that the parking lane is designed for vehicular travel. *Grimes*, however, rejected the notion that "travel" should be "broadly construed to include traversing even the smallest distance . . . ."[56] If traversing a short distance (entering and exiting the

---

[55] In *Yono I*, the Court of Appeals supported its conclusion that the entire roadbed was designed for vehicular travel by citing MCL 257.637(1)(b), which allows the driver of a vehicle to "overtake and pass upon the right" another vehicle when "unobstructed pavement not occupied by parked vehicles [is] of sufficient width for 2 or more lines of moving vehicles in each direction . . . ." *Yono I*, 299 Mich App 111-112. However, this only applies "when the vehicles are moving in substantially continuous lanes of traffic," MCL 257.637(1)(b), and MCL 257.637(2) provides that a driver may not "pass another vehicle upon the right by driving off the pavement or main-traveled portion of [a] roadway." The Court of Appeals, therefore, erred by relying only on Subsection (1)(b): by placing paint markings differentiating the parking area from the travel lanes, the highway designers indicated that the use of that area would be limited to parallel parking and the momentary ingress and egress that accompanies it. MCL 257.611(1) provides that "[t]he driver of a vehicle . . . shall not disobey the instructions of a traffic control device . . . ." MCL 257.70 defines "traffic control devices" as "all signs, signals, markings, and devices not inconsistent with this act placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning or guiding traffic."

[56] *Grimes*, 475 Mich at 90. The dissent observes that "the lines delineating the parking spots . . . specifically invite a vehicle to drive over this portion of the highway" and contrasts this invitation to that of a shoulder, "which, as its own paint markings and other designators make clear, is not designed as part of an intended route, but instead is designed to run alongside that route and provide temporary accommodation for emergently stopped or disabled vehicles." *Post* at 5. We are not persuaded. The act of parking—like the act of pulling onto the shoulder of a highway—is only incidental to travel. In each circumstance, the responsible governmental agency has separated the part

15

shoulder) is not "travel" within the meaning of the statute, we do not see how the same basic action (entering and exiting a parking lane) can be considered travel and still be faithful to our precedent.[57]

The dissent posits that the act of parking "completes, and is thus a part of," vehicular travel.[58] On this theory, "a 'parking lane' . . . is simply a type of 'travel lane'

---

of the highway designed for vehicular travel from the part of the highway where vehicles cease or begin traveling. Moreover, the responsible governmental agency specifically invites motorists to engage in incidental movement when going into and out of both shoulders and parking spaces.

[57] There is no allegation in this case, nor do we think there reasonably could be, that the distance one might travel from the right lane onto the shoulder is somehow greater than the distance one might travel from the right lane into a parallel-parking lane such as the one at issue here. The dissent believes that this is beside the point because, as the dissent sees it, even if the physical actions are the same, "the vehicle using the shoulder is digressing from the highway's designed vehicular route, whereas the vehicle using the parking spot is proceeding along it[.]" *Post* at 8. We do not find this distinction persuasive: like the vehicle using the shoulder, the vehicle using the parking spot also digresses from the highway's travel lanes—the portion of the highway designed for vehicular travel. That digression is what makes the difference in this case.

The dissent distinguishes the often unplanned movement involved in a vehicle's use of a shoulder from the often planned movement involved in its use of a parking lane. But this distinction is inconsistent with its broad definition of "travel" and shows why its rationale is ultimately inconsistent with *Grimes*. The dissent claims that a parking lane is designed for travel because travel does not end until the vehicle comes to a complete stop, while criticizing this opinion for suggesting otherwise. But, to be faithful to *Grimes*, we must recognize that travel necessarily ends before a vehicle reaches a complete stop along a shoulder. That a shoulder stop is often unplanned and a parking stop is often planned does not matter. *Grimes* informs us that a highway's design for vehicular travel does not encompass the incidental movement required to bring a vehicle to a stop along a shoulder. That holds equally true for a portion of the highway designed solely for parking, as the paint markings at issue here illustrate.

[58] *Post* at 6-7.

16

for purposes of the highway exception . . . ."[59] That a person will park at the end of travel does not turn parking into travel. To draw from the dissent's definitions, "travel" involves " 'the coming and going of people or conveyances along a route' " or " 'movement or passage in general.' "[60] These definitions connote movement, not starting or stopping a journey, and the parking lanes at issue here do not invite movement that is more sustained than that at issue in *Grimes*. Indeed, in common parlance, we consider traveling and parking to be two different things. We travel *to* our destination, and we park once we have *arrived*.

"[O]ne basic principle . . . must guide our decision today: the immunity conferred upon governmental agencies is *broad*, and the statutory exceptions thereto are to be *narrowly* construed."[61] Our caselaw teaches that "[b]ecause [MCL 691.1402(1)] is a narrowly drawn exception to a broad grant of immunity, there must be strict compliance with the conditions and restrictions of the statute."[62] We cannot conclude that the statute clearly applies to the act of parking, which is only incidental to travel and does not itself constitute travel. Accordingly, defendant is entitled to governmental immunity.[63]

---

[59] *Post* at 7.

[60] *Post* at 4, quoting *Random House Webster's College Dictionary* (2005).

[61] *Nawrocki*, 463 Mich at 158.

[62] *Id*. at 158-159, citing *Scheurman v Dep't of Transp*, 434 Mich 619, 629-630; 456 NW2d 66 (1990) (opinion by RILEY, C.J.).

[63] Because no fact questions remain regarding the highway's design, we do not reach the issue of how to resolve fact questions on a motion for summary disposition involving governmental immunity under MCR 2.116(C)(7).

Our holding does not suggest that the highway exception requires that the area in question be designed *exclusively* for vehicular travel. For example, signage might indicate particular hours during which a designated parking lane is to be used as an additional travel lane. Or a street in a residential neighborhood, with no designated parking lane, might be designed for both curbside parking and vehicular travel.[64] In this case, however, the lane was designated by the paint markings as a parking area, with no indication that it was also designed for vehicular travel. Accordingly, plaintiff cannot fit these facts into the narrow confines of the highway exception to GTLA.[65]

---

[64] This may have been the factual situation in *Nawrocki*, and, if so, it would distinguish the facts of *Nawrocki* from those of the present case. But whether the design of the highway in *Nawrocki* can be distinguished from the highway design here is irrelevant because our opinion in *Nawrocki* did not address the only question at issue in this case: whether the situs of the injury was within the improved portion of the highway "designed for vehicular travel." Instead, this Court in *Nawrocki* held only that a pedestrian could plead in avoidance of governmental immunity under the highway exception. Plaintiff, nonetheless, "remains steadfast that *Nawrocki* remains dispositive," drawing our attention to the factual similarities between that case and the present one, and even appending contemporary (though not contemporaneous) Google Maps Street View photographs of the accident site in *Nawrocki*. This effort is misplaced. As we said recently: "To argue, by working backwards from" the facts of a case to a conclusion of law not addressed by the Court "is to build a syllogism upon a conjecture." *People v Seewald*, 499 Mich 111, 121 n 26; 879 NW2d 237 (2016).

[65] The dissent posits that, under this holding, the governmental agency will sometimes have an obligation to maintain the improved portion of the highway "as to a parking-designated portion of a highway" and sometimes not. *Post* at 12. This is because we and the dissent have different understandings of what constitutes vehicular travel, not because our decision is somehow inconsistent with our prior precedent. Our decision today is entirely consistent with *Grimes*. Whether the governmental agency has an actionable duty to maintain the improved portion of the highway in reasonable repair depends on whether that portion is designed for vehicular travel, and this will *always* depend on the nature of the location at issue.

For these reasons, we reverse the judgment of the Court of Appeals and remand this case to the Court of Claims for entry of summary disposition in favor of defendant.

Joan L. Larsen
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra

STATE OF MICHIGAN

SUPREME COURT

HELEN YONO,

       Plaintiff-Appellee,

v                                        No. 150364

DEPARTMENT OF TRANSPORTATION,

       Defendant-Appellant,

_____

MCCORMACK, J. (*dissenting*).

I respectfully dissent. I agree with the majority on a number of points: that the immunity conferred by the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, is broad, and its exceptions, such as the highway exception, are narrowly drawn; that, in assessing whether the alleged defect in this case fell within the scope of that exception, it is necessary to consider the design of the highway at the time of the injury; that the highway's paint markings at that time provide relevant evidence of its design; and that neither *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143; 615 NW2d 702 (2000), nor *Grimes v Dep't of Transp*, 475 Mich 72; 715 NW2d 275 (2006), is dispositive of whether the improved portion of the highway at issue here was "designed for vehicular travel." MCL 691.1402(1). I cannot agree, however, that under a proper interpretation of the highway exception's plain language or a proper application of our precedent, the defendant is entitled to immunity and summary disposition in this case.

It is important, at the outset, to remember precisely what the controlling inquiry is: whether the alleged defect was located in "the improved portion of the highway designed for vehicular travel . . . ." MCL 691.1402(1). The majority, relying on *Grimes*, 475 Mich at 73-74, uses different language to frame this question, asking "whether a parking lane is a 'travel lane'—and therefore 'designed for vehicular travel'—within the meaning of the statute." *Grimes* did, of course, use the phrase "travel lane" in articulating its holding; the statute, however, does not, nor does it otherwise address or differentiate between types of "lanes." And as this Court has made clear, we must tread very carefully when using terminology foreign to the statute in analyzing its scope: our interpretation must always start with and remain governed by "a close examination of the statute's plain language," and not "merely attempt[] to add still another layer of judicial gloss to those interpretations of the statute previously issued by this Court and the Court of Appeals." *Nawrocki*, 463 Mich at 150. I question whether the phrase "travel lane" is an apt shorthand for "improved portion of the highway designed for vehicular travel," but regardless, our interpretive obligation is to ensure it becomes nothing more than that; the phrase must not be permitted to obscure or supplant the language chosen by the Legislature to express its intent.[1]

---

[1] The majority notes that "we are not free to disregard" *Grimes*'s holding, including its use of the phrase "travel lane." I, of course, agree that *Grimes* cannot be disregarded here, nor do I think it should be; I do not take issue with that case's ruling that shoulders are not designed for vehicular travel, and—as set forth *infra*—I find its reasoning fully compatible with and supportive of my conclusion that parking-designated portions of a highway are so designed. Reaching that conclusion requires no disregard of *Grimes* or its chosen terminology—just a proper understanding of its meaning and role in our interpretive exercise, as discussed above.

2

When construing that plain language in light of the facts of this case, I fail to see why the location of the alleged defect at issue fell outside "the improved portion of the highway designed for vehicular travel." There is no dispute here that this defect was located in an "improved portion of the highway"; the only question is whether that portion of the highway was, at the time of the injury, "designed for vehicular travel." The paint markings on the roadbed designated this portion of the highway for parallel parking, and I agree with the majority that this evidences it was designed for at least that use.[2] I disagree, however, that a portion of the highway designed for parallel parking is not "designed for vehicular travel."

The GTLA does not define "travel." The word's lay definitions vary in breadth, but they commonly comprise and contemplate a planned and purposeful progression from an origin to a destination—or, in terms particularly relevant here, the passage along a route from one point to another. As a verb, for instance, to "travel" is, variously, to "go," "move," or "pass" "from one place or point to another"; to "take a trip"; to "proceed or advance"; "to move in a fixed course, as a piece of mechanism"; and "to journey or

---

[2] In remanding this case for entry of an order granting the defendant's motion for summary disposition, the majority concludes that these paint markings evidence, as a matter of law, that this portion of the highway was designed exclusively for parallel parking. It remains unclear to me why these markings necessarily have that legal effect—that is, what authority makes clear that the presence of these markings designates this portion of the highway for parallel parking to the complete exclusion of all other vehicular uses. Ultimately, however, I see no need to reach or resolve this issue. Because, in my estimation, an improved portion of a highway designed exclusively for parking is "designed for vehicular travel," the defendant's motion fails, regardless of any factual dispute there may be over whether the portion of the highway at issue here was also designed for other vehicular uses at the time of the plaintiff's injury.

3

traverse (a specified distance)." *Random House Webster's College Dictionary* (2005). When used as a noun, as it is in the highway exception, "travel" is, for instance, "the coming and going of people or conveyances along a route," and "movement or passage in general," with "passage" being "the route or course by which a person or thing passes or travels." *Id*. "Route," in turn, is "a course, way, or road for passage or travel," and "a customary or regular line of passage or travel"; "course," similarly, is "a direction or route taken or to be taken," and "advance or progression in a particular direction." *Id*.

Accordingly, under the plain meaning of the highway exception's terms, a portion of a highway is "designed for vehicular travel" if it is designed, or intended, for a vehicle's planned and purposeful progression from origin to destination—that is, to provide a route for a vehicle's passage from one point to another. See *Suttles v Dep't of Transp*, 457 Mich 635, 648; 578 NW2d 295 (1998) (opinion by MALLETT, C.J.) (" '[T]he phrase "designed for vehicular travel" can only be reasonably interpreted to mean "*intended* for vehicular travel." ' "), quoting *Mason v Wayne Co Bd of Comm'rs*, 447 Mich 130, 137; 523 NW2d 791 (1994) (alteration in original). A highway may be designed to provide vehicles with any number of such routes; the improved portions of the highway that fall within these intended routes—and thus invite vehicles to drive over them as part of the vehicles' planned progression from one point to another—are "designed for vehicular travel," and are subject to the highway exception's duty of repair and maintenance.[3]

---

[3] The majority alludes to a "more general understanding of vehicular travel" that "stands in opposition to" the one I offer here. I am uncertain what that is, exactly; as the above makes clear, however, I agree that, for purposes of the highway exception, what matters

4

An improved portion of the highway designated for parallel parking falls comfortably within this reading of the statute's plain language. By designating a location for the parking of a vehicle, this portion of the highway is designed to provide the beginning and ending segments of the highway's intended route(s). A vehicle's passage through these beginning and ending segments constitutes a part of its "travel" as much as that vehicle's passage through various other segments of an intended route, such as those designated for thoroughfare, merging, turning, and so forth—none of which the defendant contends, or our caselaw indicates, would fall outside "the improved portion of the highway designed for vehicular travel." Indeed, the lines delineating the parking spots, like those marking these other segments, specifically invite a vehicle to drive over this portion of the highway, and offer guidance as to how. This stands in clear contrast to the portion of the highway designated as its shoulder, which, as its own paint markings and other designators make clear, is not designed as part of an intended route, but instead is designed to run alongside that route and provide temporary accommodation for emergently stopped or disabled vehicles.

The majority acknowledges and articulates much of this: namely, that a portion of a highway designated for parallel parking "specifically invites drivers to end their journeys there and, sometime later, begin new journeys," whereas "[t]he shoulder of a highway is designed as a temporary breakdown or emergency area" and "is not intended or designed to be part of a traveler's journey from one location to another." Nonetheless,

_____

is not the "actual" path a vehicle may or does end up taking over the improved portions of a highway, but the route(s) the highway was designed to provide for that vehicle in progressing from one point to another.

5

the majority concludes that this parking-designated portion of the highway is, like a shoulder, not designed for vehicular travel because "parking . . . is only incidental to travel and does not itself constitute travel." This conclusion is seemingly premised on two core points: (1) the belief that "[i]n common English usage, a parking lane is closer to being a travel lane's antonym than its synonym" because "[t]o park is to stop" but "to travel is to go" and "[w]e travel *to* our destination" but only "park once we have *arrived*" at it; and (2) the notion that "the momentary ingress and egress necessarily accompanying parallel parking" does not constitute "travel" under *Grimes* because that case "rejected the notion that 'travel' should be 'broadly construed to include traversing even the smallest distance . . . .' " I find neither point convincing.

First, as noted, focusing on whether the term "parking lane" is closer to being the synonym or the antonym of "travel lane" risks misplacing the relevant interpretive inquiry, given that the highway exception does not articulate or attempt to define itself on the basis of different types of "lanes"; it simply asks whether portions of the highway are improved and, if so, designed for vehicular travel. See *Nawrocki*, 463 Mich at 175 (overruling a prior decision of this Court for "fail[ing] to simply apply the plain language of the highway exception and, instead, rel[ying] on judicially invented phrases nowhere found in the statutory clause"). And perhaps more fundamentally, I do not find apt the majority's offered distinction between these types of "lanes," or more generally between travel and parking. As discussed, "travel" is not simply the act of going; it is the passage, the progression along a route, from one point to another. Accordingly, for purposes of interpreting the highway exception, a "travel lane" is an improved portion of the highway that is designed for such vehicular passage. The act of parking the vehicle completes,

6

and is thus a part of, that passage; I fail to see why that act would not constitute travel simply because it involves bringing the vehicle to rest.  Nor, for that matter, do I see why a vehicle should be deemed to have completed its travel, and arrived at its intended destination, at some point before it reaches that designated terminus of its route. Furthermore, and as the majority recognizes, a "parking lane" is designed not only as a means for a vehicle to end its route, but also as a means to begin one—that is, "to go."[4] Thus, even framing the inquiry with the majority's terminology, I reach the same result: a "parking lane"—like the many other "lanes" on a highway (such as a "thoroughfare lane," a "merge lane," a "turn lane," and so on), but unlike a shoulder—is simply a type of "travel lane" for purposes of the highway exception, and therefore falls within that exception's scope.

---

[4] The majority notes that the definitions of "travel" discussed above "connote movement, not starting or stopping a journey," but I see no such distinction in those definitions.  The acts of starting and stopping a journey, of course, always involve movement.  And as discussed, the definitions of "travel" contemplate passage, movement, along a route from one point to another.  Nowhere do those definitions suggest that travel comprises less than all of that movement along a route, or excludes the segments that entail departing from a designated point of origin and reaching a designated point of destination.  The majority gestures toward *Grimes* in support of that reading of "travel," but as discussed *infra*, such reliance is misplaced.

Nor do I understand the practical implications of such a construction of "travel." When is a vehicle deemed to have completed its travel—to have, as the majority put it, arrived at its destination—if not at the point where its route reaches a designated end point?  What, if not those designated points, marks the start and end of the travel?  Does the travel, for instance, simply end when the vehicle is in closest proximity to the location to which its driver ultimately plans to go after parking and exiting the vehicle?  If the driver proceeds further—down the street, around a corner, and so on—in search of an available parking spot, is none of that part of its travel?  And if it is, why, then, does the travel continue that far but then suddenly cease when the vehicle reaches some certain, but unspecified, proximity to the available spot?  I see nothing in the definitions of "travel," or in *Grimes*, that would invite these questions, let alone suggest their answers.

This feeds into the majority's second offered reason: that, under *Grimes*, a vehicle's entry into and exit from a "parking lane" is not "travel" because that movement, like a vehicle's momentary use of a shoulder, involves "the same basic action" of "traversing a short distance." For the reasons discussed, I cannot view these movements as "the same basic action" for purposes of the highway exception. It is true that, in making a brief detour onto a shoulder, a vehicle might go through the same physical actions it would in using a parallel-parking spot, with the only difference being the paint markings over which the vehicle passes in doing so. But as the majority makes clear, the paint markings cannot be ignored in our statutory analysis; they are critical indicators of the dispositive inquiry—for what purpose was the improved portion of the highway at issue designed? Accounting for this inquiry, the analogy does not hold: the vehicle using the shoulder is digressing from the highway's designed vehicular route, whereas the vehicle using the parking spot is proceeding along it; the former is not driving on a portion of the highway designed for vehicular travel, but the latter is. These two vehicular movements are thus fundamentally distinct under the highway exception, regardless of their physical similarities.[5]

---

[5] I thus agree with the majority that the "digression is what makes the difference," in that a vehicle is digressing from its intended route when it uses a shoulder, but is proceeding along that route when using a parking-designated portion of the highway. Both portions of the highway, as the majority notes, may be used by a vehicle in "com[ing] to a complete stop," but only the parking-designated portion is designed to be used by a vehicle as a part of its passage along a route from one point to another. Indeed, if a vehicle's passage between points goes as designed, the vehicle never makes use of the shoulder; that passage always will, however, and must, begin and end with use of a parking space. The critical distinction is in the design. The majority rejects this distinction—and the corresponding notion that a "parking lane" is, unlike a shoulder, just another type of "travel lane"—by repeating that parking "is only incidental to travel . . . ."

8

Nor do I read *Grimes* to bolster this analogy. I agree that *Grimes* rejected the notion that "travel" should be understood to comprise every "incremental" or "momentary" movement a vehicle may make over an improved portion of a highway. *Grimes*, 475 Mich at 89-90; it did not, however, hold, and cannot fairly be read to suggest, that "travel" necessarily excludes every vehicular movement that could be characterized as momentary, incremental, or short.

*Grimes* did not offer an affirmative definition of "travel." It acknowledged that to "travel" is commonly understood to mean "to go from one place to another," and declined to read that common understanding in its "broadest and most literal sense" such that it would necessarily "include the shortest incremental movement by a vehicle on an improved surface"—as when, for instance, "in an emergency . . . a motorist momentarily swerves onto the shoulder . . . ." *Id*. at 89 & n 51 (quotation marks and citation omitted). *Grimes* did not, however, purport to define "travel" on the basis of this single illustration, nor did it suggest that "travel" should be understood as comprising only movements of a

---

But this simply offers the conclusion in support of itself. It does not explain why use of a parking-designated portion of a highway is "incidental" to, or a "digression" from, travel when it—unlike use of a shoulder—is an intended and required part of a vehicle's route from one point to another. Nor does it explain why, in light of this distinction in design, a vehicle should be considered to have been "specifically invite[d]" by the governmental agency to "cease or begin traveling" when using a shoulder in the same way it has when using parking-designated portion of the highway. Or why "the paint markings at issue here," distinct as they may be from the solid white line designating a shoulder, should nonetheless be taken to "illustrate" this equivalence. For all the reasons discussed herein, I agree that the parking-designated portion of the highway is designed for the beginning and ending stages of travel; the shoulder, however, is designed for no such travel. Their respective markings reflect this critical distinction, and I fail to see why our ruling here should not as well.

9

certain length or duration.  Rather, what *Grimes* made clear through this illustration was that "travel" could not be construed so broadly as to categorically include every movement a vehicle does or could make on an "improved portion of the highway," as doing so would leave no meaning to the phrase "designed for vehicular travel" and would ignore the Legislature's express focus on design rather than use:

> If "travel" is broadly construed to include traversing even the smallest distance, then it must follow that every area surrounding the highway that has been improved for highway purposes is "designed for vehicular travel" since such improved portions could support even momentary vehicular "travel."  Under plaintiffs' interpretation, then, every "improved portion of the highway" is also "designed for vehicular travel." This interpretation renders these phrases redundant and contravenes a settled rule of statutory interpretation.  It also conflates two disparate concepts: design and contemplated use.  That vehicular traffic might *use* an improved portion of the highway does not mean that that portion was "designed for vehicular travel."  Therefore, in an effort to give meaning to every word of the highway exception and to honor the Legislature's expressed intent, we reject plaintiffs' construction of the highway exception.  [*Id*. at 90.]

Thus, as *Grimes* explained, "an intentionally sloped grassy median" running between the northbound and southbound lanes of a highway cannot be considered "designed for vehicular travel" simply because it has been "shaped in that fashion for any number of highway-related purposes" and "could support even momentary vehicular 'travel.' " *Id*. at 90 & n 53.  And, per *Grimes*, the same holds for the shoulder of a highway.[6]

_____

[6] In light of this emphasis on design rather than use, I struggle with the majority's suggestion that, under a "faithful" reading of *Grimes*, it simply "does not matter" "[t]hat a shoulder stop is often unplanned and a parking stop is often planned . . . ."  Ignoring that distinction, in my mind, is no more compatible with *Grimes* than ignoring the difference between a vehicle driving down the shoulder and one driving on a portion of the highway designated for thoroughfare.  For both the thoroughfare- and parking-designated portions of the highway, the governmental agency has planned, and thus designed, them to be used as part of the vehicle's route; the shoulder's usage has not been so planned.

At no point did *Grimes* suggest that this reasoning or result depended on how far a vehicle could drive on the grassy median, or shoulder, or other improved portion of the highway.[7] Nor did it suggest that two vehicular actions should be considered "the same" for purposes of the highway exception simply because they both could be characterized as "traversing a short distance." Rather, *Grimes* made clear that the phrase "designed for vehicular travel" cannot be defined to comprise every improved portion of the highway over which a vehicle could end up driving as it proceeds from one point to another, irrespective of whether the portion was designed to be used as part of the vehicle's route between those points. Nothing in *Grimes* suggests that "travel" would exclude some portions of such a designed route.[8] And indeed, no other caselaw has indicated that an improved portion of a highway is not "designed for vehicular travel" when it has been designed to be a part of a vehicle's intended route on that highway.

The majority stresses that the highway exception is to be construed narrowly. I agree. See, e.g., *Nawrocki*, 463 Mich at 149-150. It cannot, however, be construed more narrowly than the Legislature intended, as expressed through the plain language it chose.

---

[7] *Grimes*, for instance, did not suggest that the highway exception's coverage of a shoulder may depend on how far or safely the shoulder's design permitted a vehicle to drive over it; its assessment of these improved portions of a highway was categorical.

[8] This reading also comports with the majority's example of an improved portion of the highway that is normally designated as a shoulder, but has been temporarily redesignated as part of the highway's vehicular route while repairs are underway on another improved portion of the highway. The redesignation renders that portion of the highway "designed for vehicular travel"—a conclusion that depends not on what length of the shoulder has been redesignated, but instead on the fact that, through such redesignation, vehicles have been invited to drive over that portion of the highway as part of their passage from one point to another.

See *id*. at 150-151. For the reasons discussed, I am unable to discern a reading of the highway exception's plain language that is narrow enough to exclude the improved portion of the highway at issue here. Nor do I see how such a reading would comport with our established, overarching interpretive goal " '[i]n resolving the questions presented by' " the GTLA: " 'to create a cohesive, uniform, and workable set of rules which will readily define the injured party's rights and the governmental agency's liability.' " *Id*. at 148-149, quoting *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 596; 363 NW2d 641 (1984). Rather, under the majority's interpretation of the highway exception, the governmental agency has a duty to maintain and repair some segments of a vehicle's intended route, but not others; it can mark an improved portion of the highway for parking—and thus specifically intend and invite a vehicle to begin or end its route there—but unlike the other segments of that intended route, have no obligation whatsoever to ensure that it is, in fact, "reasonably safe and convenient" for such passage (or any other "public travel," for that matter). MCL 691.1402(1). The governmental agency will not always be free from this obligation as to a parking-designated portion of a highway, and likewise, a traveler will not always be afforded its assurances of safety and fitness when parking in a given spot. Whether the obligation exists, and whether a traveler can expect a parking spot to be kept safe, will vary from spot to spot, depending on whether the spot is designated only for parking and, if so, whether that designation applies all of the time, or some of it. As to the particular parking spot here, the majority instructs that the defendant had no actionable duty; as to other types of spots, or other

12

segments of a vehicle's intended route, it remains largely unclear to me how this ruling should be understood and applied.[9] None of this—the majority's ruling, or its consequences—strikes me as consistent with or supported by our prior precedent regarding how the highway exception should be interpreted. And more fundamentally, I cannot conclude that the Legislature intended any of it when plainly mandating a duty to maintain and repair "the improved portion of the highway designed for vehicular travel." MCL 691.1402(1).

The majority says this is "a line-drawing case." The lines it purports to draw, however, do not match those I see in the statute, in our precedent, or on the road. Accordingly, I dissent, and would affirm the denial of the defendant's motion for summary disposition.

Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

---

[9] What of other types of paint markings that may be used to designate a portion of the highway for parking, for instance? What is the effect of other potential designators, such as parking meters on the curb? And what if the parking-designated portion is not clearly or completely delineated; how are its boundaries—and the corresponding scope of the governmental agency's obligations—determined? Somewhat similarly, if a portion is designated exclusively for parking at some times of the day but not others, does the governmental agency's immunity depend on during which of those time periods an injury was suffered? And are there now other segments of a highway's intended vehicular route that, by similar analogy to *Grimes*, can also be broken off and carved out from the governmental agency's duty to maintain and repair? How should that assessment be made, and according to what criteria? Is it any segment of the route whose intended vehicular use can be characterized as "momentary," "incremental," "short," or some other such descriptor? At what length does a segment of a route become "incremental," and how should the segment's beginning and ending points be determined?

13